Fuld, J. (concurring).
Underlying the First Amendment is the premise that government cannot be trusted to regulate thought or opinion and that the people may and, in fact, must be left to reject for themselves false or harmful doctrine whether it involves political, moral or other precepts. (See Thomas v. Collins, 323 U. S. 516, 545, per Jackson, J., concurring; Whitney v. California, 274 U. S. 357, 375-376, per Brandeis, J., concurring.) [1] But the same reliance need not be and has never, either in theory or practice, been placed on the judgment of children, and the Constitution does not secure to them the same, almost -absolute, right assured to adults to judge and determine for themselves what they may read and what they should reject.
While the supervision of children’s reading may best be left to their parents, the knowledge that parental control or guidance cannot always be provided and society’s transcendent interest in protecting the welfare of children justify reasonable regulation of the sale of material to them. It is, therefore, altogether fitting and proper for a state to include in a statute designed to regulate the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such material to adults. And I have no doubt that such a law, punishing the sale or distribution to children of matter deemed objectionable, under criteria that would not be permissible if applied to adults, may be drafted so as not to violate the constitutional guarantees of freedom of expression. (See Butler v. Michigan, 352 U. S. 380; Jacobellis v. Ohio, 378 *313 U. S. 184, 195; cf. Prince v. Massachusetts, 321 U. S. 158, 165-168.)
It is, however, essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application. It is equally important that such legislation be drawn so as not to bring about the suppression of the sale to adults of material that is, in fact, constitutionally protected. (See Butter v. Michigan, 352 U. S. 380, supra.) In my judgment, section 484-h of the Penal Law, when viewed in this manner, is not sufficiently clear or precise to meet constitutional demands.
A reading of section 484-h cannot help but leave one in doubt 'as to the standards and criteria to be applied in enforcing it. More specifically, it is impossible to discern, from ¡the language of the provisions themselves, any difference between the standards regulating the sale of pornographic material to children (Penal Law, § 484-h) and those governing the dissemination of such matter to the reading public in general (Penal Law, § 1141). It is suggested, however, that the word “ obscene ” as used in section 484-h has another meaning which differs substantially from the meaning given it in section 1141 or in other laws applicable to adults.
The interpretation given the term “ obscene ” by the Supreme Court in Roth v. United States (354 U. S. 476) is, of necessity, as that court itself recognizes (354 U. S., at pp. 491-492; see, also, Jacobellis v. Ohio, 378 U. S. 184, 197, per Stewabt, J., concurring, supra), somewhat imprecise and elastic. But the Supreme Court has found that statutes employing “ obscene ” as a standard by which to prohibit and punish the general sale and distribution of certain material do not violate constitutional guarantees when stringent limitations are placed on the meaning and application of that term, when its coverage is limited, for instance, to material which is utterly without value and is patently offensive to prevailing standards of decency. (See, e.g., Roth v. United States, 354 U. S. 476, 484, 489, supra; Manual Enterprises v. Day, 370 U. S. 478, 488-491; Jacobellis v. Ohio, 378 U. S. 184, 191 et seq., supra.)
*314 If, though, as is argued, these limitations were not to he imposed on the term in section 484-h and the concept of obscenity as there employed were held to be a variable, having a meaning different from its meaning in other statutes, then, the vagueness of the term, far from being in any way alleviated, would be compounded and the section rendered unconstitutionally vague and indefinite. (See Winters v. New York, 333 U. S. 507, revg. 294 N. Y. 545; Paramount Film Distr. Corp. v. City of Chicago, 172 F. Supp. 69, 71-72.) Just as this court’is attempt in the Winters case (294 N. Y. 545, supra) to expand the legally accepted concept of "indecency and obscenity ’ ’ deprived those terms of whatever definiteness and certainty they acquired from past usage and from prior court opinions (see 333 U. S., at pp. 512-514, 518-520), so here—to cull from the Supreme Court’s opinion in Winters (333 U. S., at p. 519) — it would be utterly impossible, if the word "obscene” in section 484-h were interpreted as the dissenting opinion suggests, for "the actor or the trier to know where this new standard of guilt would draw the line between the allowable and the forbidden publications.” Indeed, it might well be asked, how could the booksellers in the cases before us, or anyone else for that matter, possibly have known that the term ££ obscene ” had a meaning in section 484-h different from that in section 1141?
I would only add that I find it unnecessary on this appeal to consider whether those prosecuted under a validly drawn statute (aimed at prohibiting the sale of objectionable material to children under 18 years of age) must be shown to have knowledge net only of the nature of such material but also of the age of the child involved.
The order appealed from in each case should be affirmed.

. As Mr. Justice Jackson expressed, the idea in the course of his concurring opinion in the Thomas case (323 U. S., at p. 545), “it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.”