**UNITED STATES of America, Plaintiff,**

v.

**VARIOUS ARTICLES OF MERCHANDISE, SEIZURE NO. 148, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**VARIOUS ARTICLES OF MERCHANDISE, SEIZURE NO. 150, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**VARIOUS ARTICLES OF MERCHANDISE, SEIZURE NO. 151, Defendant.**

**Nos. 84 C 7997, 84 C 8129 and 84 C 8611.**

United States District Court, N.D. Illinois, E.D.

Jan. 7, 1985.

Patrice Scully, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

### (INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW)

SHADUR, District Judge.

These in rem actions have been brought by the United States for forfeiture and destruction of allegedly obscene imported material seized from the United States mails by the Customs Service.[1] For the reasons stated in this opinion's findings of fact and conclusions of law, issued as mandated by *United States v. Various Articles of Merchandise, Seizure No. 170*, 750 F.2d 596 (7th Cir.1984), this Court concludes all the seized materials are obscene and shall therefore be forfeited and destroyed.

---

1. Both the seizure and these actions have been undertaken pursuant to Tariff Act of 1930 § 305(a) as amended, 19 U.S.C. § 1305(a) ("Section 1305(a)").

### This Court's Mandate Under Seizure No. 170

In a different context this Court has had occasion to state its invariable procedure of conducting a personal review of all materials tendered in obscenity forfeiture proceedings. *United States v. Miscellaneous Pornographic Magazines*, 526 F.Supp. 460, 467–68 (N.D.Ill.1981) (hereinafter cited *"YourStyle,"* after the name of the publisher plaintiff in the consolidated action that triggered all the substantive discussion in that opinion).[2] It may be that our Court of Appeals' decision in *Seizure No. 170* was motivated at least in part by its concern lest District Courts might slight—or perhaps even eschew—the distasteful, though constitutionally mandated, task of personal review (thus *Seizure No. 170*, at 599, referred to the need "to provoke care on the part of the district judge").

All the same, this Court's own experience indicates the commendable desire of our Court of Appeals ("So that review in these cases will not be illusory ... and to bring some rationality into these proceedings," *Seizure No. 170*, at 598), when translated into practice, most frequently proves unrealistic. Almost all the materials tendered to this Court in such proceedings over the years have been what might be termed *Jacobellian*—bringing into play the truly inspired observation (though its overuse has tended to make it commonplace) by Justice Stewart, concurring in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964):

> I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description ["hard-core pornography"]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

Whenever a case is an obvious "I know it when I see it" candidate, with the seized material compelling an equally obvious affirmative conclusion as to obscenity, it is extraordinarily difficult if not impossible to articulate any meaningful findings of fact of a kind that would ease the task of appellate review. As the Supreme Court Justices themselves have found in obscenity cases, there is no substitute for their viewing the offending materials and reaching their own conclusions as to "patent offensiveness." And that problem is really at the hard core of the conclusion recently expressed by the Second Circuit in *United States v. Various Articles of Obscene Merchandise, Schedule No. 2102*, 709 F.2d 132, 136 (2d Cir.1983) (a conclusion rejected and impliedly criticized by our own Court of Appeals in *Seizure No. 170*, at 598)[3]:

> Although appellate courts are required to exercise *de novo* review as to the preliminary substantive requirement that the material be "hard core" pornographic in nature, *Jenkins v. Georgia, supra*, 418 U.S. [153] at 160–61, 94 S.Ct. [2750]

**2.** In material part *YourStyle* dealt with some of the intriguing questions posed by the importation of foreign-language magazines containing photographs that, viewed alone, would appear obscene. For example, the obscenity vel non of the "work as a whole" might arguably be different for an audience of non-speakers of the foreign language (to whom the "work" is entirely pictorial) than for an audience able to read the text as well as look at the pictures. *YourStyle*, 526 F.Supp. at 465–67. Yet in conceptual terms obscenity is supposed to be an *objective* standard, and it is supposed to be the *work* as a whole that is judged objectively. In that respect this Court notes parenthetically that as a result of the *YourStyle* decision, the Customs Service changed its procedures nationally to conform to the directive in Part 2 of that opinion. In any case, only two of the current materials even

potentially pose the problem dealt with in *YourStyle* (in each of those two instances the text accompanying the photographs is entirely in another language), but in each instance the content of the photos is such that the "work as a whole" is necessarily obscene for *any* audience of "average persons in the relevant community."

**3.** *Seizure No. 170*, at 598 cited *United States v. Various Articles of Obscene Merchandise, Schedule No. 2127*, 705 F.2d 41, 44 (2d Cir.1983) for the proposition represented by the quotation in the text. However, this Court's examination of *Schedule No. 2127* disclosed neither any such quoted language nor any such holding in that case. Though this is necessarily only a guess, it does appear *Schedule No. 2102* was really the case meant to be referred to in *Seizure No. 170*.

at 2754–55 [41 L.Ed.2d 642], the trier's finding that the material is non-obscene is virtually shielded from appellate scrutiny, at least absent evidence that it is so clearly unreasonable as to amount to abuse of discretion.

One other factor that impelled our Court of Appeals to adopt its requirement for "explicit findings and conclusions" (*Seizure No. 170*, at 599) does not withstand analysis: its citation of *United States v. Various Articles of Obscene Merchandise, Schedule No. 2098*, 536 F.Supp. 50, 53 (S.D. N.Y.1981) for the proposition that "a finding of obscenity as to an article would be res judicata (in the same community, presumably) for subsequent importations of that same article" (*Seizure No. 170*, at 599). Even a brief rehearsal of the concept of res judicata or claim preclusion—which bars subsequent litigation *between the same parties* to the prior litigation—makes the suggested application of that concept to Section 1305(a) forfeitures bizarre indeed. It must be remembered the producer or distributor of the publication receives *no* notice of the Section 1305(a) proceedings—only the addressee of the seized copy does.[4] Obvious due process infirmities would attach to a conclusive determination of obscenity of a publication, made binding on the real party in interest who has had *no* notice or opportunity to litigate, with the determination having been rendered in a proceeding in which an addressee of a copy was the only party notified. In fact the same due process concerns should apply even to a later proceeding involving a different addressee of the same publication, who also has not had his or her day in court.

Merely labeling the proceeding "in rem" does not alter matters, for the subject of in rem proceedings—the property subject to destruction—is only a particular item of property (in this case a copy of a publication), not the generic class of which that item of property may be a part. That is the established wisdom in the res judicata field—or more accurately, the field of collateral estoppel or issue preclusion, for the problem with which our Court of Appeals was rightly concerned in *Seizure No. 170* was the prospect of binding a *different* litigant in a future lawsuit involving the same publication. We need look no farther than the Restatement of Judgments to show that the unsupported "res judicata" statement in *Schedule No. 2098* (referred to with apparent approval in *Seizure No. 170*, at 599) is not only unsupported but unsupportable in law as well as in logic.[5]

This is not to minimize the practical (as distinct from legal) effect of a court's declaration that a copy of a publication is obscene. Such a prior determination may well have a precedential influence on another District Judge who is later called upon to consider forfeiture of another copy of the same publication. But that prospect is totally distinct from a res judicata determination that would *foreclose* such later review. And even the practical persuasiveness of an earlier declaration of obscenity is necessarily diminished if the earlier forfeiture is one that went by default, without the usual testing in the crucible of the adversary process.

Despite the somewhat questionable underpinnings discussed in this section, this Court will of course essay the task presented by *Seizure No. 170* in every Section 1305 case delivered to its calendar under this District Court's random assignment

---

**4.** Even that addressee (absent his or her voluntary general appearance for that purpose, which is unnecessary to permit the addressee to contest the forfeiture) is not subject to jurisdiction over his or her *person* in the forfeiture proceedings. Section 1305(a), involving as it does only an in rem determination as to the seized material, does not require service of process on the addressee. Indeed the addressee is often not even subject to service of process, for the statute requires that the proceedings be brought in the district housing the customs office where the seizure took place—not the district of residence of the addressee. Only a mailed notice of the seizure and the proceedings is typically given the addressee. See the Appendix for a broader exposition of the non-res-judicata effects of such in rem proceedings.

**5.** See Appendix.

system.[6] Its analysis of the materials in issue in these cases follows.

### Application of the Standards in These Actions

*Seizure No. 170*, at 597 paraphrased the familiar constitutional test of *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) this way:

> To determine whether a particular item is obscene, we apply a three-part test: first, the work, taken as a whole, must appeal to prurient interests; second, the work must portray sexual conduct in a patently offensive way; and third, the work, taken as a whole, must lack serious literary, artistic, political or scientific value.

As in *Seizure No. 170*, the works at issue here unquestionably fall comfortably within the first and third criteria. Observation demonstrates that result without the need for any discussion, and this Court so finds.[7] That leaves only the issue of patent offensiveness for resolution.

Both the District Court and the Court of Appeals in *Seizure No. 170* looked to the "average person in the relevant community" for that determination. There is no doubt the graphic depiction of sexual matters has undergone a dramatic revolution in taste in a single generation. In 1963 (if recollection does not play false) this Court and its then partners in the law practice defended Hugh Hefner against a City of Chicago obscenity charge stemming from photographs in an issue of *Playboy* magazine. One of those offending photos showed actress Jayne Mansfield (a "sex symbol" of that era) in bed and apparently unclothed (though she was substantially covered by the bedsheets, and no genitalia were at all visible in the photographs), with

a male actor *sitting fully clothed* (indeed maybe even wearing a fedora, again if recollection is not playing tricks) on the same bed. Other photos showed Ms. Mansfield in other situations, but none depicted any sexual activity or any frontal nudity that included genitalia. Of course those pictures were not obscene, but the very fact they could then stimulate an obscenity prosecution (while today they would not stimulate sale of a magazine, let alone much if any prurient interest) suggests how and to what extent other times have produced other mores.

At the same time this Court cannot permit the mere fact that some commercial market now exists for a product to compel a *negative* decision as to its patent offensiveness, for the ultimate result of that kind of analysis (or lack of it) would compel judicial denial of *every* forfeiture where the addressee is a consumer who has ordered the merchandise. "Contemporary community standards," for patent offensiveness purposes, must look to the judgment of the "average person in the community, rather than the most prudish or the most tolerant," *Smith v. United States*, 431 U.S. 291, 304, 97 S.Ct. 1756, 1765, 52 L.Ed.2d 324 (1977). As *Seizure No. 170*, at 600 put it:

> We have already noted that availability [in the relevant community of similar materials] is not simply to be equated with acceptability, although there is, of course, an obvious linkage.

Contrast the differing decisions by the Court of Appeals for the Second Circuit in *Schedule No. 2102*, 709 F.2d at 134–37 (and Judge Meskill's concurrence, *id.* at 137–38), on the one hand, with *Schedule No. 2127*, 705 F.2d 41, 43–44 (2d Cir.1983) and the

---

**6.** Both because all such cases share the problems already identified in the text, and because (judging by this Court's experience to date) in almost none of such cases will the requirement of detailed findings (let alone the possible appointment of an amicus, *Seizure No. 170*, at 599) add anything constructive to the proceedings, this opinion's discussion will be made a part of every future set of findings and conclusions to which it is relevant. There is after all the exam-

ple set by Cato in his repetition of the same refrain at the end of every speech (on any subject) on the floor of the Roman Senate: Delenda est Carthago (Carthage must be destroyed).

**7.** That finding as to each of the seized materials is also implicit in their description, found later in this opinion.

earlier decision in *Schedule No. 2102*, 678 F.2d 433, 435 (2d Cir.1982), on the other.

This opinion will turn then to the materials seized in these actions. All the following individual findings will simply classify the kinds of activities depicted, as a consequence of which this Court has found both the kind of activity and the blatant method of its depiction in each of the seized materials clearly "portray sexual conduct in a patently offensive way"—doing violence to contemporary community standards.

*Seizure No. 170*, at 599 (citations omitted) identified one risk-fraught government alternative in these cases:

> The government, of course, is under no constitutional obligation to provide evidence of community standards.... The material, if hard core, may be left to speak for itself.... If the government does not present evidence, however, it must be prepared to have the district court declare that, by its lights, the material is not self-evidently offensive to the community....

That is the course the United States has pursued here. As it develops, the risk has not materialized. This Court has in turn determined (expressing "its own sense of what the standards of the relevant community are," *id.*, at 601) that the purveying of "dirt for dirt's sake" in the manner represented by each of the seized materials is "self-evidently offensive to the community" (*id.*, at 599). It may be that our society (or at least the Chicago area, the "relevant community" in this case) will some day decline to the level at which such blatant portrays of sexual conduct are not "patently offensive"—but in this Court's view it requires no more evidence than a direct review of the materials themselves to find that day has not yet arrived for the materials seized in these cases.

■ It should be underscored that this has been an individualized determination, not one predicated on lumping the seizures together. Responsive to our Court of Appeals' directive, a brief summary of the materials follows:

### 1. *Seizure No. 148*

*Item 1*—"Sex Inspiration No. 7" is a magazine containing still photographs depicting persons engaged in cunnilingus, fellatio, mutual and self-masturbation (including the use of dildos) and genital intercourse, with graphic exposure of genitalia throughout the photos and an occasional view of ejaculated semen.

*Item 2*—Each of "Top Porno," "Venus Studio," "Top Sex No. 2," "Super Porno" and "Club Tabu 1" has contents of the same description as Item 1, except that the last two magazines include several innocuous introductory photos before getting down to their principal business.

*Items 3–10*—Each of these consists of advertising materials for like magazines and comparable films. Their advertisements contain graphic descriptions of all conceivable variants of sexual activity, together with sample depictions of each of the advertised publications showing the sexual activity itself.

*Item 11*—"Joyboy 32" is a magazine devoted to photographs depicting young boys engaged in fellatio, mutual and self-masturbation and anal intercourse, with some of the photographs showing ejaculated semen.

*Item 12*—"DeVaar BV Nr. 8" is a book-sized glossy catalogue of magazines and video cassettes depicting all the kinds of sexual activity referred to throughout these findings, again together with a graphic sample depiction from each of the advertised materials.

*Item 13*—"Sex Bizarre 32" is a later edition of the publication of the same name described in *Seizure No. 170*, at 597, with content conforming to the Court of Appeals' description.

*Item 14*—"Dream Boy 7" is a later edition of the publication described in *Seizure No. 170*, at 600–601, and it too includes the showing of ejaculated semen from the adolescent boys depicted in the publication.

*Item 15*—"Animal Orgy 12" is a magazine showing lesbian cunnilingus, then a series of graphic photographs of a variety

of sex acts with animals ("bestiality," in the literal sexual sense), with human fellatio and genital intercourse interspersed.

*Items 16–18*—"Lesbian Quintet" is a film devoted entirely to women engaging in cunnilingus, mutual and self-masturbation and the extensive use of dildos for simulated genital intercourse.

### 2. *Seizure No. 150*

*Items 1–4*—These are advertising materials identical to Items 3–10 of *Seizure 148*.

*Item 5*—"Sex Bizarre 30" is an earlier edition of Item 13 of *Seizure 148*, showing identical kinds of activity.

*Item 6*—"Sweet Little 16" is a more than 70-page glossy-photograph magazine, beginning with a one-paragraph "Editorial" that recites some homilies and concludes by saying:

> There are so many things to make this life worth living, one of them could be this magazine.

What follows is an uninterrupted series of photographs of sexual manipulation, fellatio, genital intercourse, cunnilingus, masturbation and anal intercourse, some of the photographs again including ejaculated semen. Finally the "Readers Corner" contains letters about and pictures of like activities from correspondents. Though the magazine even contains a centerfold, its differences from such magazines as *Playboy* and *Penthouse* enormously outweigh the similarities—it is no better than an obscene parody.

*Item 7*—"Pony Party" is a film showing cunnilingus and then bestiality (the latter involving the "hero" identified in the film's caption).

### 3. *Seizure No. 151*

*Items 1, 2 and 5*—These are advertising circulars for films portraying substantially all the activities described in these findings, again including graphic picture portrayals as well as descriptions.

*Item 3*—"Anal Sex 50" is a magazine showing not only an extensive gallery of acts conforming to the magazine title but also cunnilingus, fellatio, genital intercourse and female masturbation through use of dildos, with some of the photos once again depicting ejaculated semen.

*Item 4*—"Anal Sex Nr. 4"—This item fits the same description.

*Item 6*—This untitled 8 mm. film contains (after a fleeting innocuous introductory scene) a graphic and continuous depiction of active male homosexual conduct of the kinds shown in still photographs in Item 11 of *Seizure No. 148*—except that young men rather than young boys are engaged in the activity.

*Item 7*—"Video Index 84" is a perhaps 100-page glossy color index of films depicting all the kinds of activities described in these findings, once again with a graphic and salacious description of the contents of those films.

*Items 8–11*—"Horny Massage" is a film depicting fellatio, genital intercourse, cunnilingus (including lesbian cunnilingus) and masturbation. Once again there are depictions of ejaculated semen, this time on film.

*Items 12–13*—These items have been destroyed pursuant to consent of the addressees obtained administratively.

*Item 14*—This comprises seven long-play video cassettes (all directed to the same addressee), each containing three or four full-length films (it appears the cassettes are the conventional six-hour size). In several instances the cassettes include conventional motion pictures (e.g., Charles Bronson in "Death Wish II" and Clint Eastwood in "Sudden Impact"). But even those cassettes have one or more films (and the other cassettes have each of their films) devoted entirely—except for some purported excuse for a story line—to activities of the nature described in these findings. Because of the video cassette medium, the films are enabled to have sound tracks that, by recording the sounds of the sexual activities, add to the pornographic character of the pictures. All of the sex-related films are thus plainly obscene. And this Court will not do what the distributor has

not chosen to do: separate the fractional legitimate content from the obscene. All the tapes will be destroyed.

*Items 15–17*—"Toy 37" is a magazine targeted to homosexuals who are "into" leather, rubber and uniforms. It both describes and depicts not only male genitalia, in close-up as well as longer-range shots, but also anal intercourse.

### Conclusion

All the materials that are the subject matters of these actions are obscene under the controlling legal tests. All are declared forfeited and shall be destroyed.

### Appendix

Even a brief review of the basic principles of claim preclusion and issue preclusion, as applicable to in rem proceedings, demonstrates the unsoundness of the District Court's statement in *Schedule No. 2098*, 536 F.Supp. at 53. Restatement (Second) of Judgments 2d § 30 (adopted and promulgated June 12, 1980)[1] provides (emphasis added):

A valid and final judgment in an action based only on jurisdiction to determine interests in a thing:

(1) Is conclusive *as to those interests* with regard to *all persons*, if the judgment purports to have that effect (traditionally described as "in rem"), or with regard to the named parties, if the judgment purports to have that effect (traditionally described as "quasi in rem"); and

(2) Does not bind anyone with respect to a personal liability; and

(3) Is conclusive *between parties*, in accordance with the rules of *issue preclusion*, as to any *issues actually litigated* by them *and determined* in the action.

One of the listed examples of actions covered by that principle is "actions by the government to forfeit a thing used in violation of the revenue or other laws" (*id.* Comment *a*)—a definition clearly broad enough to embrace forfeitures under Section 1305(a). Comment *a* teaches that in such actions "a court may enter a final judgment purporting to bind all persons in the world with respect to interests in the property (traditionally described as a judgment 'in rem'" and that "interests in the thing are conclusively determined even as to parties who default," *but* (emphasis added):

The foregoing effects of a judgment with respect to interests in a thing must be distinguished from the effects as to issue preclusion—collateral and direct estoppel—discussed in Comment *d*, below. *There can be no such preclusion except as between parties appearing and litigating particular issues.*

Comment *d* in turn repeats the classic rules of issue preclusion (no emphasis is added, because every sentence (and nearly every phrase) puts another nail in the coffin entombing any idea of res judicata on the issue of obscenity):

A valid judgment based only on jurisdiction over a thing is conclusive as to interests in the thing, even as to nonappearing parties (see Comment *a*). Such a judgment has no further conclusive effect except in accordance with the rules of issue preclusion set forth in §§ 27, 28. Under those rules, parties who have appeared in the action and litigated an issue as adversaries will normally be precluded from relitigating that issue if its determination was essential to the judgment.

And the Reporter's Note on Comment *d* states (citations omitted):

That there are no estoppel effects if the adverse claimant does not appear, even though the judgment is conclusive in fix-

---

**1.** Research into the use of the Restatement in the courts requires special care, because of the shifts in section numbering between the original Restatement and the most recent version (referred to in this Appendix). Current Section 30 carries forward the same subject matter that appeared in Sections 73 and 75 of the first Restatement. Indeed, even in the Tentative Drafts that led to the current version, present Section 30 still appeared as Section 73.

ing the interests in the thing, is shown by the following cases.

It follows a fortiori from the quoted principles that a *non-party* to the first action suffers no estoppel effects (most notably on the key issue of obscenity). And though that is more obviously so if the addressee in the first case did not choose to appear in the proceedings, it is equally true even if that first addressee—not authorized to *represent* the non-party (such as a second addressee or the publisher or distributor)—*did* appear in the first case.