PEOPLE *v.* WASSERMAN

Opinion of the Court

1. Criminal Law—Obscenity—Newspaper Article.

A newspaper article is a writing complete in itself, and hence is not saved from obscenity prosecution because of other material printed in the newspaper which may not be objectionable (MCLA § 750.343a).

2. Constitutional Law—Obscenity.

Obscenity is not protected by the First Amendment to the Federal Constitution. (US Const, Am 1).

3. Criminal Law—New Trial—Discretion.

Trial court did not abuse its discretion in denying a motion for a new trial where there was ample room for the verdict of the jury on the facts.

4. Criminal Law—Constitutional Law—Obscenity—Definition.

The test of whether a writing is obscene is whether the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.

5. Criminal Law—Constitutional Law—Obscenity.

Three elements must coalesce for a writing to be found obscene; it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex, (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters, and (c) the material is utterly without redeeming social value.

---

References for Points in Headnotes

[1] 50 Am Jur 2d, Lewdness, Indecency, and Obscenity § 22.
[2, 4–9] 59 Am Jur 2d, Lewdness, Indecency, and Obscenity § 22.
  Modern Concept of Obscenity. 5 ALR3d 1158.
[3] 39 Am Jur, New Trial §§ 13, 131, 201.

Dissent by
Bronson, J.

6. Criminal Law—Constitutional Law—Obscenity—Appeal and
Error.

*The Court of Appeals must make a judgment independent of the
juy's verdict in order to decide whether an article is obscene
in the constitutional sense.*

7. Criminal Law—Constitutional Law—Obscenity—Words Used
for Shock Value.

*An article was not obscene in the constitutional sense, although
certain words appearing in that article may have been used
for their shock value.*

8. Criminal Law—Constitutional Law—Obscenity—Language.

*An author is constitutionally at liberty to use the three- and
four-letter words which mean buttocks, vulva, coitus, urine and
excrement to tell a story which is not without literary merit.*

9. Criminal Law—Constitutional Law—Obscenity—Language.

*The State cannot constitutionally differentiate between one liter-
ary work and another, both communicating the same thoughts
and images, according to the delicacy of the words chosen to
convey those thoughts and images.*

Appeal from Ottawa, Raymond L. Smith, J.  Sub-
mitted Division 3 May 5, 1970, at Grand Rapids.
(Docket No. 7,830.)  Decided October 1, 1970.

James Wasserman was convicted of distributing
a lewd, obscene, indecent and filthy article.  Defend-
ant appeals.  Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Calvin Bosman,* Pros-
ecuting Attorney, and *James W. Bussard,* Special
Assistant Prosecuting Attorney, for the people.

*Joseph C. Legatz* (*Marcus, McCroskey, Libner,
Reamon, Williams & Dilley,* of counsel), for defend-
ant.

Before: Holbrook, P. J., and Bronson and Munro,* JJ.

Holbrook, P. J. Defendant was convicted in the circuit court for Ottawa County before a jury of distributing a lewd, obscene, indecent and filthy article in a weekly college newspaper of which he was the editor, contrary to MCLA § 750.343a (Stat Ann 1970 Cum Supp § 28.575[1]).

Defendant was sentenced to pay costs of $100 and, after denial of his motion for a new trial, has appealed to this Court.

The statute under which defendant was convicted and the test to be applied to determine obscenity is stated as follows:

"Any person who knowingly either sells, lends, gives away, distributes, shows or transmutes or offers either to sell, lend, give away, distribute, show or transmute, or has in his possession with intent either to sell, lend, give away, distribute, show or transmute, or advertise in any manner, or who otherwise knowingly offers for either loan, gift, sale or distribution, any obscene, lewd, lascivious, filthy or indecent, sadistic or masochistic book, magazine, pamphlet, newspaper, story paper, *writing,* paper, phonograph record, picture, drawing, photograph, motion picture film, figure, image, wire or tape recording or any *written, printed* or recorded *matter* of an indecent character which may or may not require mechanical or other means to be transmuted into auditory, visual or sensory representations of such character, shall be guilty of a misdemeanor, and upon conviction shall be punished by imprisonment in the county jail for not more than 1 year or by a fine of not more than $1,000, or by both such fine and imprisonment." (Emphasis supplied.)

---

* Circuit judge, sitting on the Court of Appeals by assignment.

MCLA § 750.343a (Stat Ann 1970 Cum Supp § 28.575[1]).

"The test to be applied in cases under section 343a of this act shall not be whether sexual desires or sexually improper thoughts would be aroused in those comprising a particular segment of the community, the young, the immature or the highly prudish, or would leave another segment, the scientific or highly educated or the so-called worldly wise and sophisticated, indifferent and unmoved. But such test shall be the effect of the book, picture or other subject to complaint considered as a whole, not upon any particular class, but upon all those whom it is likely to reach, that is, its impact upon the average person in the community. The book, picture or other subject of complaint must be judged as a whole in its entire context, not by considering detached or separate portions only, and by the standards of common conscience of the community of the contemporary period of the violation charged." MCLA § 750.343b (Stat Ann 1970 Cum Supp § 28.575[2]).

There is no question as to the fact that the defendant was the editor and caused to be distributed the newspaper and the article in question, "A Typical Day in the Life of J. Oswald Jones."

Defendant raises two issues on appeal which we restate as follows:

1. Whether the criminal obscenity statute permits the selection of one story from the challenged material, a newspaper, and the submission of that one story to the jury apart from the newspaper as a whole?

2. Was the story, "A Typical Day in the Life of J. Oswald Jones", obscene in the constitutional sense?

Defendant does not contest the fact that the statute fully complies with the constitutional re-

quirements as set forth in *Roth* v. *United States* (1957), 354 US 476 (77 S Ct 1304, 1 L Ed 2d 1498).

## I

The newspaper as a whole consists of four pages. The writing involved as charged in this offense appears on the last page and is entitled "A Typical Day in the Life of J. Oswald Jones" (J. Oswald Jones, an autobiography) by James Wasserman. In addition to this article, on the last page are three poems and an advertisement of one of the theatres. The story is complete in itself, does not refer to any other part of the newspaper and we conclude that under the language of the statute that the story in question was a *"writing"* complete in itself and is not saved from prosecution because of other material printed in the newspaper which may not be objectionable.

## II

No objections have been made to the instructions of the court to the jury and therefore we consider the matter properly submitted for determination. In *Roth* v. *United States, supra,* the law on obscenity is thoroughly considered and is applicable to the case herein. Obscenity is not protected by the First Amendment to our Federal Constitution. A reiteration of the story in question in this opinion would not be of benefit to the decision nor to those who might read it. Suffice it to say that we agree with the trial judge in his ruling on the motion for a new trial wherein he stated:

"In the opinion of the court there was ample room for the decision of the jury on the facts."

In the case of *Memoirs* v. *Massachusetts* (1966), 383 US 413 (86 S Ct 975, 16 L Ed 2d 1), obscenity was defined as follows at p 418:

"We defined obscenity in *Roth* in the following terms: 'Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 US, at 489 (77 S Ct at 1311, 1 L Ed 2d at 1509). Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

After reading the story, "A Typical Day in the Life of J. Oswald Jones", we are constrained to rule that the trial judge was correct and that there was ample evidence presented to the jury for them to determine the defendant guilty of the offense charged.

Affirmed.

MUNRO, J., concurred.

BRONSON, J., (*dissenting*). I am unable to agree with the decision reached by my colleagues. In deciding whether the article in question is "obscene in the constitutional sense", this Court is obliged to make a judgment *independent* of the jury's verdict. *Jacobellis* v. *Ohio* (1964), 378 US 184 (84 S Ct 1676, 12 L Ed 2d 793); *People* v. *Billingsley* (1969), 20 Mich App 10; *Bloss* v. *Dykema* (1970), 398 US 278 (90 S Ct 1727, 26 L Ed 2d 230), *reversing Grand Rapids City Attorney* v. *Bloss* (1969), 17 Mich App 318.

It is a dangerous precedent for this Court to give its judicial stamp of approval to this prosecution

and conviction.   Doing so, I fear, takes us a dangerous step in the direction of thought control.[1] People, college students among them, ought to be protected from the overeager use of prosecutorial machinery such as was here implemented.

Although certain words appearing in the article in question may have been used for their shock value, it is not obscene in the constitutional sense. *Redrup* v. *New York* (1967), 386 US 767, 769 (87 S Ct 1414, 18 L Ed 2d 515); *Memoirs* v. *Massachusetts* (1966), 383 US 413, 418 (86 S Ct 975, 16 L Ed 2d 1); *People* v. *Billingsley, supra.*   See, generally, *Roth* v. *United States* (1957), 354 US 476 (77 S Ct 1304, 1 L Ed 2d 1498).

The article, "A Typical Day in the Life of J. Oswald Jones", is not without literary merit.   Indeed, such was the testimony of English professors who were called upon to testify as expert witnesses for and on behalf of defendant.   The article tells a story and tells it graphically.[2]

The author's choice of language may not appeal to the prosecutor, the jury, or this appellate tribunal. The objected-to words are, however, in common use. The author is constitutionally at liberty to use the three- and four-letter words which mean buttocks, vulva, coitus, urine, and excrement to tell the story of J. Oswald Jones, a man full of years who fears his life is behind.

"The fact that considerably more profanity is used   *   *   *   to convey the same fundamental ideas, thoughts, and images, cannot be the basis of a meaningful, workable, constitutional distinction. The constitutional right to communicate ideas would

---

[1] For an excellent discussion in the area of student publications see C. Michael Abbott, The Student Press:   Some First Impressions, 16 Wayne L Rev 1 (1969).

[2] For those whose curiosity is piqued, the article that became the *cause célèbre* at Grand Valley State College is reprinted on pp 23–25.

be unduly limited if the State could take upon itself the right to prohibit the use of certain words, however offensive and odious they may be, to communicate those ideas.   The State cannot constitutionally differentiate between one [literary work] and another, both communicating the same thoughts and images, according to the delicacy of the words chosen to convey those thoughts and images.   The exercise of the constitutional right does not depend on the author's euphemistic skill." *People* v. *Billingsley* (1969), 20 Mich App 10, 17, 18.

I would reverse the conviction.

## APPENDIX

### J. Oswald Jones: An Autobiography

### By James Wasserman

#### *A Typical Day in the Life of J. Oswald Jones*

There was no wind, it was warm, unusually warm for October.   A full harvest moon hung like a pregnant basketball against the backboard of a cloudless sky, its orange light grinding sharp shadows into the dead cement of an East Side street.

No—no, that would not do for an opening.   There was no moon, it was December, and it was cold.   Moving to his window J. Oswald Jones looked down at the Christmas crowd—a tangled mass of humanity moving like wind-blown garbage.   Although it was not yet 7:00 Eva was already on her corner, but the sight of Eva did not arouse him anymore.   There is something too capitalistic—too mechanical about prostitutes.   Eva was a machine.   Ladies and gentlemen, put a dime in the slot and watch Eva go!   He was a machine too, a tired machine that needed oil.   Ladies and gentlemen, put a dime in the slot and get juiced up by Little Eva!   Only her juice didn't turn him on like it used to.   The layers of crud were too thick and he knew Eva too well.   Perhaps no woman could really juice him up again.   At any rate Eva couldn't, perhaps never really had.   Eva was no longer beautiful and he desired only beautiful women.   Only they could start the sludge pump in his groin.

Now it was Joannie the social worker.   Joannie of the swollen breasts.   Joannie of the flaming cunt.   Joannie of the silky—no, that was too weak an adjective—Joannie of the meaty thighs.   In fact Joannie was meaty all over.   Grade A, Choice Cut, Lean Red Meat. Government inspected and stamped.   But not J. Oswald Jones stamped and this rankled him.

"O let me pluck thy rose, sweet, sweet, Joan of Arc."

"Oswald you devil you."

"Let me taste of thy liquid cunt."

"Oh Oswald you're so arty. That's what I . . ."

"Aw for Chrissake give me a piece!"

"Get your filthy hands off of me."

"Stop it! Stop it!"

He had—dammit!

A windowed reflection of his own face leered back at J. Oswald Jones. He was not beautiful, even with a beard which covered up his weak chin and disguised his too thin lips. He was balding rapidly and the wrinkles etched in his face made his small eyes look even worse. He wasn't ugly, though, just—just mediocre. Mediocre in everything he was or did.

He had had many women. Ambitious women who made love to J. Oswald Jones the writer, not J. Oswald Jones the man. Hydro-electric generators, they could turn themselves on and off at will, and rip out his guts with their turbined crotches. He didn't turn them on, he couldn't, no man could and somehow none of them were really beautiful.

Funny, he felt sorry for beautiful women. Other women hated them for what they were. Men treated them as mere sexual objects, nothing more. They could never afford to lose their cool. And now the tide was turning against them. What with the Shrimp, Twiggy, and Julie Christie, the Anti-Godess. Why not the Anti-Godess?—in a way it was long overdue. No godess for the anti-hero.

The neon lights flickered fitfully above O'Malley's bar. He noticed that the M was out.

"The Northern Lights have seen queer sights,

But the queerest they ever did see

Was that night on the marge of Lake Lebarge

I cremated Sam McGee."

Sam McGee was a masochist. How often he had been dissected, roasted, eaten and regurgitated whole again. Ever since the days of that Bald Wonder—Wee Willie Shakespeare. And yet he still sucked it up. Old Sam had a craving for the crap. Yet it never really affected him. Maybe that made Sam McGee a sadist. Sam knew who held the aces and it wasn't J. Oswald Jones. Sam ran—rather Sam was the show. Society Sam paid for the books, sat his ass down in front of his suburban fireplace and laughed.

Laughed at J. Oswald Jones, the satirist who thought he could cremate Society Sam. Sam kept him alive for amusement, just as medieval monarchs kept fools, dwarves, eunuchs and other freaks. After 500 years of the Bald Wonder, Sam was shockproof, uncremata-table, snug within his asbestos skin. All the time J. Oswald Jones thought that he had been spitting on Sam's boots and here he had been licking them.

After two beers J. Oswald Jones had to piss. He was getting old. He couldn't hold it in the way he used to, and so there he was sitting on the shit can of the universe watching the ebb and flow of the tide in the john bowl, King Oswald I sitting on his golden throne. Scribbled into the brown walls were the symbols of his kingdom. Coats of Arms in the shape of huge disemboweled genitals. Even a motto—'If you can't drink it, drive it, or screw it; forget it!' He would have to remember that one. But above all there was the WORD and the WORD was F-U-C-K. The universal language of his king-dom. What motivated men to write that one lone word? Fuck what? O'Malley? Life? God? Country? Motherhood? Apple pie? The

girl next door? Fuck them all, but what the scribes really were saying was fuck Sam, for the rest were one in Sam. He wondered if Sam knew what the scribes had written. Sam would be pleased if he did. J. Oswald Jones would lick Sam's boots once more.

The light reflected dimly off the gray cement floor as a man in the next stall lit a cigarette. "And the Lord said let there be light." J. Oswald Jones was not impressed, he felt that he could top the Creator. He looked around his universe and found it not lacking. His universe was complete, a world unto itself. The phrase sounded good, a little too good. It was not his own. It smacked too much of the Biblical. He must begin again.

The Alienation theme—how often it had been milked. Could it be milked again, it would have to be. It was old, but it was not shopworn. No—not yet, not ever.

J. Oswald Jones wondered why he did not kill himself.

What a finish would that be. Tragic endings were always the best, were there any other kind? Who would write it though? Why, let everyman write J. Oswald's epitaph. Out of the dusty loins of J. Oswald Jones a new cult would emerge. Marilyn had her cult, Papa had his, so Lennie and Bogey too. But one had to be dead first, and J. Oswald Jones feared death. What was it like on the other side? Did one just get moldied up while trading quips with the maggots? "The worms go in, the worms go out, the worms play pinochle on your snout. But one littl worm who's not so shy goes in your ear and comes out your eye."

That would be alright. But had God really kicked the can? If so, why? Did he contact some fatal disease? Rabies? Gout? Syphilis? Or maybe he was scratched by the Holy Ghost in a super terrestial gang war?

J. Oswald hated to admit it, but it was even possible that the ball belonged to the Billy Graham's with their Halleluiah's and their traveling clip joints. I say unto you my children, that whatsoever you do unto Billy's belly you do unto my belly. He imagined that both Billy and God had fat bellies. Yes, one had to have pull to make the scene at the pearly gates. But no man can serve two masters, and if one was going to prostitute himself he might as well get paid for his services. Death was an enigma, an extremely popular enigma. No one yet had found a way to beat the death rap. Same old shit. Generation after generation, one wave of humanity hitting the shore, sucked back to give way to another wave, and the shore never flinched, did it?

The cold night air slowed, rather than revived his senses. The rust was building up inside. J. Oswald Jones craved oil badly. He was on his way to Eva's—Sam would like that.