## TODD v ROCHESTER COMMUNITY SCHOOLS

### OPINION OF THE COURT

1. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—ESTABLISH-
MENT OF RELIGION.

A public educational institution cannot espouse as part of its·
teaching program any expressions of religious belief *pro* or
*contra* as representative of the beliefs of the institution, but it
is well within its teaching function to list as reading material
particular books which the faculty regards as valuable to the
full exposure of the student to conflicting views of religious
beliefs so long as the institution does not advocate any religious
beliefs doctrinally (US Const, Ams I, XIV).

2. CONSTITUTIONAL LAW—FIRST AMENDMENT—RELIGION—SCHOOLS
AND SCHOOL DISTRICTS—BOOKS.

Use of the novel "Slaughterhouse-Five", in which certain charac-
ters express sentiments that are derogatory of the religious
beliefs of a large segment of society, in a current literature
course in a public school did not violate the First Amendment
establishment of religion prohibition, absent any allegation
that the teacher of the course advocated, approved or promul-
gated concepts offensive to established religious beliefs or or-
ganized religious sects, or that any anti-religious views were
espoused, as opposed to merely making the novel available as
course material (US Const, Ams I, XIV).

### OPINION BY BRONSON, P. J.

3. JUDGMENT—SUMMARY JUDGMENT—PLEADING—AFFIDAVITS—COURT
RULES.

*No supporting affidavit is necessary on a defendant's motion for
summary judgment where the complaint pleads a cause of
action unknown to the law because constitutionally impermissi-
ble (GCR 1963, 117).*

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4–7] 47 Am Jur, Schools §§ 208–215.
[3] 61 Am Jur 2d, Pleading §§ 298–304.

4. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—BOOKS—RELIGIOUS REFERENCES.

*No portion of any constitution is violated simply because a book used in a public school course contains and makes reference to religious matters; this concept is legally repugnant to the rationale underlying the First and Fourteenth Amendments (US Const, Ams I, XIV).*

5. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—BOOKS—RELIGIOUS REFERENCES.

*Use of the novel "Slaughterhouse-Five" in a current literature course of a public school district was not shown to be a violation of the constitutional prohibition of an establishment of religion where there was no allegation or proof that the novel was being taught subjectively, or that the religious or anti-religious views contained in the book were espoused by the teachers (US Const, Ams I, XIV).*

6. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—BOOKS—OBSCENITY.

*The Court of Appeals should hold that a book used in a current literature course in a public school district is not obscene under present constitutional tests where, although obscenity was not raised by the pleadings and was expressly declared not to be an issue by the trial court, the trial court's judgment that the book is anti-religious and therefore should not be used is pervaded by his feeling that it is obscene (US Const, Ams I, XIV).*

7. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW.

*A judge cannot constitutionally substitute his judgment of what is "right" and "moral" for that of a lawfully-elected school board, its supervisory personnel and its teachers, who have the duty of determining the local schools' curriculum, in deciding whether a certain book may be included as reading matter in a course in current literature (US Const, Art VI).*

Appeal from Oakland, Arthur E. Moore, J. Submitted Division 2 February 9, 1972, at Detroit. (Docket No. 12001.) Decided June 12, 1972.

Complaint by Bruce Livingston Todd against the Rochester Community Schools for a writ of mandamus to compel defendant to cease using the book "Slaughterhouse-Five" as part of a course of in-

struction. Writ issued. Defendant appeals. Reversed, and summary judgment entered for defendant.

*Darden, Neef & Heitsch,* for plaintiff.

*Monaghan, McCrone, Campbell & Crawmer* (by *Michael J. Charbonneau),* for defendant.

Amicus Curiae: American Civil Liberties Union of Michigan (by *Bruce T. Leitman* and *Stanley W. Kurzman).*

Before: BRONSON, P. J., and V. J. BRENNAN and O'HARA,* JJ.

O'HARA, J. *(concurring in result).* Judge BRENNAN and I concur only in the result reached by Judge BRONSON. We are not prepared to endorse his opinion.

We feel the basic point involved here is not whether the book in question is *per se* obscene or pornographic as those terms have been judicially defined by the United States Supreme Court. This is made clear by the following finding of the trial judge.

"The issues in this case have to do solely with the doctrine of separation of religion and state, and there is nothing before the court on which to rule concerning mere obscenity, pornography * * * ."

There is no doubt, as the trial court noted, that certain *characters* in the novel express sentiments that are derogatory of the religious beliefs of a very sizable segment of our society. However, the novel in question is merely listed as one of a

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

number of books reflective of a current literary style. It is not alleged that the teacher of the course advocated, approved or promulgated concepts offensive to established religious beliefs or organized religious sects.

This, of course, is precisely the point. Writings, contemporary as well as of ages past, have attributed to characters beliefs and expressions highly antagonistic to established religious beliefs. Manifestly, many of these writings have attained classical status. As we view the constitutional test, a public educational institution cannot espouse as part of its teaching program such expressions of belief *pro* or *contra* as representative of the beliefs of the institution. In the presentation of reading material, the public institution is well within its teaching function to list the particular books the faculty regards as valuable to the full exposure of the student to conflicting views of religious beliefs. To advocate the views doctrinally as those of the institution is quite another thing. It is not alleged that defendant in this case espoused any anti-religious views as opposed merely to making available course material.

We find no violation of the "establishment" clause of the First Amendment.

The judgment granting mandamus against defendant school system is reversed. The case is remanded to the trial court for entry under directions to grant defendant motion for summary judgment.

No costs.

V. J. BRENNAN, J., concurred.

BRONSON, P. J. On March 24, 1971, plaintiff, Bruce Livingston Todd, filed a complaint for a writ of mandamus against the defendant, Rochester

Community Schools, in the Oakland County Circuit Court. Mr. Todd's complaint alleged that one of his minor children was enrolled in a course of instruction referred to as "Current Literature" which was being taught in a Rochester public high school. Plaintiff averred that part of the curriculum in said course was the study of *Slaughterhouse-Five or The Children's Crusade*,[1] a novel by the contemporary American author, Kurt Vonnegut, Jr.

The gravamen of plaintiff's complaint was that *Slaughterhouse-Five* "contains and makes reference to religious matters" and, therefore, "the use of such book as a part or in connection with any course of instruction by a public school district or system is illegal and contrary to the laws of the land; namely, the First and Fourteenth Amendments of the United States Constitution".[2] Predicated on these factual allegations, Mr. Todd requested that the Oakland County Circuit Court issue a writ of mandamus compelling the defendant school district to cease utilizing *Slaughterhouse-Five* "as a part of a course of instruction in the Rochester Community Schools". In his complaint, Mr. Todd did not allege that *Slaughterhouse-Five* was obscene nor that it had no literary value.

On March 31, 1971, defendant answered plaintiff's complaint. In its pleading the Rochester Community Schools affirmatively stated that the novel at issue, along with several others, "is used in connection with a general secular course of instruction entitled 'Current Literature' and the fact that the same might incidentally refer to religious

---

[1] The novel was published in 1969 by the Delacorte Press, Inc., of New York.

[2] The quoted textual passages in this paragraph of the opinion are taken verbatim from paragraphs 4 and 5 of plaintiff's complaint.

matters does not render its use in violation of the
First and Fourteenth Amendments of the Constitu-
tion of the United States". Defendant further con-
tended that the selection of books to be used in its
course of instruction was a matter exclusively
within its administrative powers and not subject to
judicial supervision nor review.[3]

Subsequent to answering, defendant filed a mo-
tion for summary judgment of no cause of action
on the basis that there was no genuine issue as to
any material fact and that the Rochester Commu-
nity School District was entitled to judgment as a
matter of law. GCR 1963, 117.2(3). A hearing on
this motion was held on April 7, 1971, before the
Honorable Arthur E. Moore, Circuit Judge for the
County of Oakland. At this time the parties stipu-
lated to allow the novel into evidence, formally
waived pretrial, and agreed to accept the court's
decision predicated upon the pleadings, briefs, and
motions, with the book itself constituting the sole
evidence.

On May 13, 1971, the court filed a nine-page
opinion granting plaintiff's requested relief "if
necessary". On May 20, 1971, in the trial judge's
temporary absence, the Presiding Judge of the
Oakland County Circuit Court entered a judgment

[3] The "Current Literature" course offered by the Rochester Commu-
nity Schools was not part of the prescribed curriculum but was an
elective. Some of the other literature which was required reading for
the course was: *Arsenic and Old Lace, The Detective Story,* Herman
Hesse's *Steppenwolf, The American Dream,* short stories by J. D.
Salinger, and selected poetry by James Dickey, Allen Ginsberg, Law-
rence Ferlinghetti, and Howard Nemerov. The supplemental reading
list for the course included: *Love Story* by Erich Segal, *Walden II* by
B. F. Skinner, *Catch-22* by Joseph Heller, *Waiting for Godot* by
Samuel Beckett, *Catcher in the Rye* by J. D. Salinger, *The An-
dromeda Strain* by Michael Crichton, *Who's Afraid of Virginia Woolf?*
by Edward Albee and *The Power and the Glory* by Graham Greene.
Since plaintiff apparently did not find these writings to violate the
First and Fourteenth Amendments, we express no judicial opinion as
to their constitutional validity. Nor is such necessary.

of mandamus. However, on May 28, 1971, the trial judge, on his own motion, set aside the May 20, 1971 judgment so he could make more appropriate findings of fact and law. GCR 1963, 517.1. A new hearing was held before Judge Moore on June 5, 1971. On June 9, 1971, a final opinion and order granting plaintiff a judgment of mandamus was issued.[4]

On June 18, 1971, defendant filed a claim of appeal as a matter of right. On July 16, 1971, this Court granted the American Civil Liberties Union of Michigan permission to file a brief *amicus curiae*.[5]

After thorough study of the proceedings below, including a careful scrutiny of *Slaughterhouse-Five,* and aware that some of the legal questions suggested by these proceedings have apparently never been squarely passed upon by any other court in this country, we are constrained to reverse the trial court's judgment and permanently dissolve the previously issued judgment of mandamus. The reasons for our actions follow.

Initially we consider what we believe should have been the proper disposition of this matter in the court below. As previously indicated on March 31, 1971, defendant filed a motion for summary judgment pursuant to GCR 1963, 117.2(3). Technically, defendant's requested relief was more properly predicated upon the authority of GCR 1963, 117.2(1). For reasons we are about to delineate, we hold that even if all the factual allegations

---

[4] The May 13, 1971 and June 9, 1971 opinions by Judge Moore are meticulous and thorough. We commend him for his steadfast adherence to GCR 1963, 517.1. Relevant portions of both opinions will be set out later in this opinion.

[5] This Court wishes to express its gratitude to the American Civil Liberties Union of Michigan for its valued assistance as *amicus curiae.*

pleaded in the instant complaint are taken to be true, *Bielski v Wolverine Insurance Co,* 379 Mich 280, 283 (1967), plaintiff still has "failed to state a claim upon which relief can be granted" and defendant should prevail as a matter of law.

Our Court considered the nature of GCR 1963, 117.2(1) in *Major v Schmidt Trucking Co,* 15 Mich App 75 (1968). In *Major,* Judge CHARLES LEVIN, writing for a unanimous panel, observed that:

> "A motion under GCR 1963, 117.2(1) asserts that the opposing party's pleading fails to state a claim upon which relief can be granted. The motion may be granted only where it appears on the face of the challenged pleading that the pleader cannot recover." *Major, supra,* at 78.

See, also, *Bloss v Williams,* 15 Mich App 228, 231 (1968); *Johnston's Administrator v United Airlines,* 23 Mich App 279, 286 (1970). The fact that defendant chose to support its motion by appending an affidavit is perfectly proper inasmuch as the combining of subparts of GCR 1963, 117 has been approved. *Durant v Stahlin,* 375 Mich 628, 644 (1965). But it was not necessary for defendant to affix an affidavit with its motion for summary judgment to prevail inasmuch as plaintiff's complaint pleads an alleged cause of action heretofore unknown to our law.[6] Plaintiff's theory will remain

---

[6] The complaint is herein set out in full:

"Now comes, Bruce Livingston Todd, a resident of the County of Oakland, residing at 753 Charlesina, Oakland Township, Oakland County, Michigan, and complaint *[sic]* of the Rochester Community Schools, a body corporate, defendant herein, named pursuant to RJA 600.4401 and GCR [1963] 710, as follows:

"1) One of plaintiff's children is lawfully enrolled in the Rochester Community Schools and is attending the prescribed classes of instruction pursuant to the curriculum requirements and specifications.

"2) As a part of said curriculum is a course of study referred to as 'Current Literature'.

"3) As a part of said 'Current Literature' course of instruction is

an unwelcome stranger to our jurisprudence unless and until the United States Supreme Court or our State Supreme Court dictate otherwise.

Pursuant to GCR 1963, 820.1(1) and (7) we grant defendant's requested summary judgment of no cause of action and reverse the trial court's judgment of mandamus.

Plaintiff's complaint specifically pleads only that *Slaughterhouse-Five* is used in a public school and "contains and makes reference to religious matters". We have been cited to no authority, nor has our own research uncovered any, which holds that *any* portion of *any* constitution is violated simply because a novel, utilized in a public school "contains and makes reference to religious matters".

---

the offered reading of a book titled, 'Slaughterhouse-Five' or 'The Children's Crusade' believed to have been authored by one Kurt Vonnegut, Jr. and published by Dell Publishing Company, Inc. of New York, New York.

"4) Said book contains and makes reference to religious matters.

"5) The use of such book as a part of or in connection with any course of instruction by a public school district or system is illegal and contrary to the laws of this land; namely, the First and Fourteenth Amendments of the Constitution of the United States, pursuant to the determinations of the Supreme Court of the United States, to-wit: *Engel v Vitale,* 370 US 421; 82 S Ct 1261; 8 L Ed 2d 601 (1962), and *DeSpain v DeKalb County Community School District,* 384 F2d 836 (1967), *et al.*

"6) Plaintiff herein has often requested of defendant herein that said book, to-wit: 'Slaughterhouse-Five' or 'The Children's Crusade', be withdrawn from and as a part of the curriculum offered by defendant has failed and refused to do so, and defendant continues to employ said book as a part of its offered course of instruction contrary to the laws of this land.

"Wherefore, plaintiff prays that a writ of mandamus be issued adjudging said book, 'Slaughterhouse-Five' or 'The Children's Crusade' to be unlawful and unfit for use as a part of a course of instruction offered by defendant, The Rochester Community Schools; or

"In the Alternative

"That this court issue its order to show cause pursuant to the petition and affidavit of Bruce Livingston Todd, plaintiff herein, the originals of which are attached hereto and made a part of this complaint and that said matter be brought on for an immediate hearing and determination by this honorable court."

This concept is legally repugnant to what we believe is the time-tested rationale underlying the First and Fourteenth Amendments. By couching a personal grievance in First Amendment language, one may not stifle freedom of expression. Vigorously opposed to such a suggestion, we stand firm in rendering plaintiff's theory constitutionally impermissible.

If plaintiff's contention was correct, then public school students could no longer marvel at Sir Galahad's saintly quest for the Holy Grail, nor be introduced to the dangers of Hitler's *Mein Kampf* nor read the mellifluous poetry of John Milton and John Donne. Unhappily, Robin Hood would be forced to forage without Friar Tuck and Shakespeare would have to delete Shylock from *The Merchant of Venice.* Is this to be the state of our law? Our Constitution does not command ignorance; on the contrary, it assures the people that the state may not relegate them to such a status and guarantees to all the precious and unfettered freedom of pursuing one's own intellectual pleasures in one's own personal way.

We hasten to point out that plaintiff did not allege that the Rochester public schools were intentionally taking action which was derogatory to Christianity. Nor did plaintiff aver that defendant was attempting to "establish" any specific religious sect in preference over another; nor one over all others; nor none at all. Had plaintiff's complaint suggested such a state of affairs, the question before the Court would be substantially different. But in this case the evidence is undisputed that the novel in question, and the Bible, were being utilized as literature. There is no allegation nor proof that *Slaughterhouse-Five* was being taught subjectively, or that the religious or anti-religious

views contained therein were espoused by the teachers.

Portions of the trial court's rulings were as follows:

"40. It is hereby ordered that the book, 'Slaughterhouse-Five or The Children's Crusade', be forthwith removed from the defendant's school library.

"41. It is further ordered that the book may not be fostered, promoted or recommended for use in the defendant's school system; and defendant is ordered to desist accordingly.

"42. It is further ordered that the book is banned from the school library only so long as is necessary to prevent its use as promoted or recommended reading material in the courses of study in defendant's school system.

"43. The book may be returned to the library shelves of the defendant school if and when the defendant has definitely and conclusively withdrawn and desisted from the promotion, recommendation and use of the book in educational courses of the defendant school system. This mandamus order may then be amended for that specific purpose on appropriate motion of counsel."

In rendering his decision the trial court relied solely upon *Abington School District v Schempp,* 374 US 203; 83 S Ct 1560; 10 L Ed 2d 844 (1963). *Schempp* held that a statute requiring daily Bible reading without comment in public schools violated the First Amendment, even though participation by each pupil was voluntary. *Schempp* is totally dissimilar to the case at bar. *Schempp* turned upon the fact that reciting a prayer in public schools had no connection whatsoever with secular education. Saying the prayer was an end in itself. Such conduct had as its primary purpose the advancement of religion; the relationship be-

tween prayer and education was non-existent.[7]
This cannot be said about *Slaughterhouse-Five*. In
our opinion, Mr. Vonnegut's novel is an anti-war
allegory which dwells on the horror of the Allied
fire-bombing of Dresden[8] and which makes ancil-
lary use of religious matter only for literary rea-
sons. But whatever our insight or ability as critics,
we are strongly persuaded that, as judges, we are
correct in holding that *Slaughterhouse-Five* is not
violative of the *Schempp* test:

"The test may be stated as follows: what are the
purpose and the primary effect of the enactment? If
either is the advancement or inhibition of religion then
the enactment exceeds the scope of legislative power as
circumscribed by the Constitution. That is to say that to
withstand the strictures of the Establishment Clause

---

[7] As Mr. Justice Brennan so ably articulated in his concurring
opinion in *Schempp, supra:*

" * * * What the Framers meant to foreclose, and what our deci-
sions under the Establishment Clause have forbidden, are those
involvements of religious with secular institutions which (a) serve the
essentially religious activities of religious institutions; (b) employ the
organs of government for essentially religious purposes; or (c) use
essentially religious means to serve governmental ends, where secular
means would suffice. * * * " 374 US at 294–295; 83 S Ct at 1609–
1610; 10 L Ed 2d at 899.

"The holding of the Court today plainly does not foreclose teaching
*about* the Holy Scriptures or about the differences between religious
sects in classes in literature or history. Indeed, whether or not the
Bible is involved, it would be impossible to teach meaningfully many
subjects in the social sciences or the humanities without some men-
tion of religion. To what extent, and at what points in the curriculum,
religious materials should be cited are matters which the courts ought
to entrust very largely to the experienced officials who superintend
our Nation's public schools. They are experts in such matters, and we
are not. We should heed Mr. Justice Jackson's caveat that any
attempt by this Court to announce curricular standards would be 'to
decree a uniform, rigid and, if we are consistent, an unchanging
standard for countless school boards representing and serving highly
localized groups which not only differ from each other but which
themselves from time to time change attitudes.' * * * " 374 US at
300–301; 83 S Ct at 1612–1613; 10 L Ed 2d at 902–903.

[8] Kurt Vonnegut, Jr. personally witnessed this carnage while in a
Nazi prisoner of war camp. See, *Slaughterhouse-Five* at 1; 93 Time
108–109 (April 11, 1969).

there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. * * * " *Abington School District v Schempp,* 374 US 203, 222; 83 S Ct 1560; 10 L Ed 2d 844, 858 (1963).

See, also, *Board of Education of Central School District No 1 v Allen,* 392 US 236, 243; 88 S Ct 1923, 1926; 20 L Ed 2d 1060, 1065 (1968); *Walz v Tax Commission of the City of New York,* 397 US 664; 90 S Ct 1409; 25 L Ed 2d 697 (1970). Mr. Justice Brennan's concurring opinion in *Schempp* is highly instructive as to the proper interpretation of that decision:

"The holding of the Court today plainly does not foreclose teaching *about* the Holy Scriptures or about the differences between religious sects in classes in literature or history. Indeed, whether or not the Bible is involved, it would be impossible to teach meaningfully many subjects in the social sciences or the humanities without some mention of religion. *To what extent, and at what points in the curriculum; religious materials should be cited are matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools. They are experts in such matters, and we are not.* We should heed Mr. Justice Jackson's *caveat* that any attempt by this Court to announce curricular standards would be 'to decree a uniform, rigid and, if we are consistent, an unchanging standard for countless school boards representing and serving highly localized groups which not only differ from each other but which themselves from time to time change attitudes.' * * * " (Emphasis supplied.) *Abington School District v Schempp, supra,* at 300–301 (Brennan, J., concurring).

Our scrutiny of *Zorach v Clauson,* 343 US 306; 72 S Ct 679; 96 L Ed 954 (1952); *Illinois ex rel McCollum v Champaign County Board of Educa-*

*tion,* 333 US 203; 68 S Ct 461; 92 L Ed 649 (1948);
*Torcaso v Watkins,* 367 US 488; 81 S Ct 1680; 6 L
Ed 2d 982 (1961); *Engel v Vitale,* 370 US 421; 82 S
Ct 1261; 8 L Ed 2d 601 (1962), and the famous
*Everson v Board of Education of Ewing Township,*
330 US 1; 67 S Ct 504; 91 L Ed 711 (1947), all of
which authoritatively construe the First Amend-
ment's religion clauses, leads us to conclude that
the learned trial judge misapplied the teachings of
the First Amendment and the specific holding of
*Schempp.*[9]

Obscenity, although not raised in the pleadings,
and declared not to be at issue in the trial court's
June 9, 1971 judgment, is pervasive in the lower
court's opinion.

In his findings of fact, the trial judge did indeed
cite many words which, if standing alone, would
offend some person's sensibilities. Yet each and
every example advanced by the trial court was
taken totally out of context. This is constitutional
error. *Ackerman v United States,* 293 F2d 449 (CA
9, 1961); *Haldeman v United States,* 340 F2d 59
(CA 10, 1965); *People v Stabile,* 58 Misc 2d 905;
296 NYS2d 815 (1969). To be constitutionally ob-
scene, the matter scrutinized must be judged in its
entirety. *Roth v United States,* 354 US 476; 77 S
Ct 1304; 1 L Ed 2d 1498 (1957); *Excellent Publica-
tions, Inc v United States,* 309 F2d 362 (CA 1,
1962); *State v Hudson County News Co,* 41 NJ 247;
196 A2d 225 (1963). As *amicus curiae* correctly
points out, even the Bible may be considered pro-
fane or vulgar if certain passages are considered

---

[9] The Michigan Supreme Court apparently stands four-square with
the *Schempp* test. See *Advisory Opinion re: Constitutionality of P A
1970, No 100,* 384 Mich 82 (1970), which has perhaps been overruled
on the issue of "parochiaid". See, generally, Downey and Roberts,
*Freedom From Federal Establishment* (1964) and *Church, State and
Freedom* (1967), by Leo Pfeffer.

piece-meal and without due regard given to the entire text.[10]

The Supreme Court has clearly held that it is incumbent upon a court to employ a constitutional test to determine whether a given work is "obscene" in the legal sense. *Memoirs v Massachusetts,* 383 US 413; 86 S Ct 975; 16 L Ed 2d 1 (1966). In *Jacobellis v Ohio,* 378 US 184; 84 S Ct 1676; 12 L Ed 2d 793 (1964), the Court eloquently articulated the dangers of a Balkanized obscenity standard. Neither the trial court nor this Court has any legal prerogative to refuse to follow the rulings of the United States Supreme Court when it decides a question which requires interpretation of the Federal Constitution. *Scholle v Secretary of State,* 360 Mich 1 (1960); *Union Central Life Insurance Co v Peters,* 361 Mich 283 (1960). See, also, *People v Gonzales,* 356 Mich 247, 262–263 (1959); *People v Temple,* 23 Mich App 651, 661 (1970).

Although the trial court did not expressly rule that *Slaughterhouse-Five* was obscene, his June 9, 1971 judgment strongly suggests that possibility. We are constrained to hold that *Slaughterhouse-Five* is clearly not obscene under present constitutional tests. *Roth v United States, supra; Jacobellis v Ohio, supra; Redrup v New York,* 386 US 767; 87 S Ct 1414; 18 L Ed 2d 515 (1967); *People v Wasserman,* 27 Mich App 16 (1970); *People v Billingsley,* 20 Mich App 10 (1969); *Wayne County Prosecutor v Doerfler,* 14 Mich App 428 (1968).

Courts cannot permit themselves the luxury of refusing to adhere to a constitutional standard of review. When a court momentarily forgets this fact, as we did in *Grand Rapids City Attorney v Bloss,* 17 Mich App 318 (1969), a higher court usually terminates this judicial forgetfulness. *Bloss*

---

[10] See, *e. g.,* Genesis 19:33.

*v Dykema,* 398 US 278; 90 S Ct 1727; 26 L Ed 2d 230 (1970).

Judges are mortal and therefore are heir to the delightful differences which make up the human species. Nevertheless, when passing upon an alleged obscenity issue, we must strive to put aside our personal predilections and strictly adhere to the authoritative United States Supreme Court decisions.[11]

In *Redrup, supra,* the Court found the paperback books *Lust Pool* and *Shame Agent* not to be obscene. We believe that it is ludicrous to consider *Slaughterhouse-Five* in the same literary niche as *Lust Pool* and *Shame Agent.* If the latter are not convicted because of their alleged profanity, then the former should never even stand trial. *Slaughterhouse-Five* is Sunday school reading compared to these paperbacks. We do not wish to demean Mr. Vonnegut by making such ridiculous comparisons. That he is a serious writer has been attested to by those whose literary credentials are more impressive than our own.[12]

"Obscenity" is a mercurial matter. As Mr. Justice Harlan recently said for the Court in *Cohen v California,* 403 US 15, 25; 91 S Ct 1780, 1788; 29 L Ed 2d 284, 294 (1971):

"[I]t is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual."

We concur.

---

[11] To insure objective, rather than subjective, review the Fifth Circuit Court of Appeals has held that expert testimony is required on community obscenity standards. *United States v Groner,* (CA 5, 1972) 10 Crim L Rep 2283–2284, rehearing en banc granted March 28, 1972.

[12] See, *e. g.,* Granville Hicks, *Saturday Review* (March 27, 1969).

We hold that, as a matter of law, *Slaughter-house-Five* is not obscene in the constitutional sense. Under the authority granted us by GCR 1963, 820.6, we find as a matter of fact that *Slaughterhouse-Five* is not obscene, profane, or vulgar in the constitutional sense. We believe it to be a serious work of quasi-fiction by an acknowledged legitimate writer. The book's dominant theme is anti-war. The subject, war, slaughter, bombing, may be obscene: the telling of the tale is not.[13]

Defendant and *amicus curiae* urge that the real issue underlying this case is that a circuit judge, or any government official, has no lawful right to impose his own particular value judgments on our citizenry in matters which are traditionally protected by the penumbra of the First Amendment. They argue that that, in fact, is what happened here and meticulously cite the trial record for factual support. For the reasons outlined below, we entertain no doubt that defendant and *amicus curiae* are legally correct and that the trial court abused its discretion in entering this traditionally sacred area.

One of the reasons that our constitutions have wisely precluded sovereign interference with an individual's right to read, think, speak, observe, and pray as he desires is the fact that these concepts are so arbitrary and diverse that they are foreign to standardization and any possible test of right-wrong. Government has no legitimate interest in controlling or tabulating the human mind nor the fuel that feeds it.

---

[13] The following sentiment of Kurt Vonnegut, Jr., is perhaps self-explanatory:

"Addressing his editor, Seymour Lawrence, Vonnegut says: 'Sam— here's the book. It is so short and jumbled and jangled, Sam, because there is nothing intelligent to say about a massacre.'" *Saturday Review*, p 25 (March 27, 1969).

In his May 11, 1971 opinion, the trial judge stated:

"The court did read the book as requested for determination of factual matters and issues of law alike, and unfortunately did thus waste considerable time. At points, the court was deeply disgusted. How any educator entrusted during school hours with the educational, emotional and moral welfare and healthy growth of children could do other than reject such cheap, valueless reading material, is incomprehensible. Its repetitious obscenity and immorality, merely degrade and defile, teaching nothing. Contemporary literature, of real educational value to youth abounds, contains scientific, social and cultural facts, of which youth need more to know, today.

"Certainly, it is unnecessary for any school system to search out and select obscenity, pornography, or deviated immorality in order to teach modern literature.

"Modern desire for complete licentious freedom has evidently led some educators into the fallacy that degradation of subject matter in reading and thought, is a necessary part of freedom in modern education. Does the modern trend of education permit mental prostitution, and encourage mental deviation? If so, this is a sad distortion of educational purpose."

While the May 11, 1971 opinion was subsequently superseded by a later one, the former is instructive insomuch as it allows this Court the opportunity to follow the trial judge's judicial thought process. Clearly, the trial judge found *Slaughterhouse-Five* to be a "bad" book, totally worthless and utterly lacking in any merit, literary or otherwise. But as Shakespeare reminds us in language antedating almost all of our sacred precedent, "There is nothing either good or bad, but thinking makes it so". (Hamlet, Act II, Scene 2, line 259). This Court cannot, in good conscience, nor in adherence to our constitutional oath of office, allow a non-educational public official the right, in absence of gross constitutional transgressions, to regulate the read-

ing material to which our students are exposed. Our Constitution will tolerate no supreme censor nor allow any man to superimpose his judgment on that of others so that the latter are denied the freedom to decide and choose for themselves.

The reasons for such a philosophy are basic to the American system of jurisprudence. Judges pass on the law not upon morals. It is, then, perhaps ironic that the most able articulation of judicial non-intervention in matters of conscience and personal conviction was penned by the distinguished English playwright Robert Bolt. In *A Man for All Seasons,* Sir Thomas More, the sacred ancestor of our judiciary, is infused by Mr. Bolt with the following language:

*"More:* * * * The law, Roper, the law. I know what's legal not what's right. And I'll stick to what's legal.

*"Roper:* Then you set man's law above God's!

*"More:* No, far below; but let *me* draw your attention to a fact—I'm *not* God. The currents and eddies of right and wrong, which you find such plain sailing, I can't navigate. I'm no voyager. But in the thickets of the law, oh, there I'm a forester. I doubt if there's a man alive who could follow me there, thank God * * * ." *A Man for All Seasons,* 37 (Vintage Books, N.Y., 1960).

What does the law say when it speaks to this precise issue? No American jurist ever stated the basic premise better than Mr. Justice Jackson in his now classic opinion in *West Virginia State Board of Education v Barnette,* 319 US 624, 642; 63 S Ct 1178, 1187; 87 L Ed 1628, 1639 (1943):

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion * * * ."

It is clear from the trial court's May 11, 1971 opinion that he viewed reading *Slaughterhouse-Five* as a "waste (of) considerable time". He found the novel to be "deeply disgust(ing)", "cheap, valueless reading material", repetitious in its obscenity, "incomprehensible", "immoral", "defil(ing)", and totally non-instructive. He further said "Certainly, it is unnecessary for any school system to search out and select obscenity, pornography, or deviated immorality in order to teach modern literature". Capsulized, the trial judge found *Slaughterhouse-Five* to be "rubbish".

Turning again for guidance to Mr. Justice Jackson,[14] we approvingly cite and adopt the following language from his scholarly dissent in *United States v Ballard,* 322 US 78, 95; 64 S Ct 882, 890; 88 L Ed 1148, 1158 (1944):

"But that is precisely the thing the Constitution put beyond the reach of the prosecutor, for the price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish."[15]

We are concerned that in this case the trial court, in attempting to adjudicate this matter, substituted its own judgment of what is "right" and "moral" for that of the student, the teacher,

[14] Lest it be thought that somehow Justice Robert Jackson was incapable of taking a firm, "moral" stance on an issue, we have not forgotten that it was this legal giant, perhaps the most eloquent man ever to wear the robes of a Justice of the United States Supreme Court, who successfully headed the prosecution of the chief Nazi war criminals at Nuremberg.

[15] Similarly, see the recent decision in *United States v Head,* 317 F Supp 1138, 1146 (1970), in which the Court said:

"The whole thrust of the First Amendment is to shelter expression from the value judgments of those in power; when any judge or prosecutor attempts to assess speech, he must do so in his own coin—a coin that is by definition suspect."

and the duly constituted school authority.[16] Such action is resolutely forbidden by the Constitution. It is for the lawfully elected school board, its supervisory personnel and its teachers to determine the local schools' curriculum. The judicial censor is *persona non grata* in formation of public education. *Epperson v Arkansas,* 393 US 97, 104; 89 S Ct 266, 270; 21 L Ed 2d 228, 234 (1968). "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools", *Shelton v Tucker,* 364 US 479, 487; 81 S Ct 247, 251; 5 L Ed 2d 231, 236 (1960), but the trial court's actions in this case abridge these priceless, guaranteed academic freedoms and "cast a pall of orthodoxy over the classroom". *Keyishian v Board of Regents,* 385 US 589, 603; 87 S Ct 675, 683; 17 L Ed 2d 629, 640 (1967). We cannot approve such action by the judiciary nor any other government official. US Const, art VI, § 2; *Sweezy v New Hampshire,* 354 US 234, 250; 77 S Ct 1203, 1211–1212; 1 L Ed 2d 1311, 1324–1325 (1957). Schools are an institution, indeed the only institution, in which our youth is exposed to exciting and competing ideas, varying from antiquity to the present.

It is the trial court's right to select the reading matter which he personally consumes. That is a matter purely for his own conscience, preference and appetite. On the other hand, the judicial garb should never be mistaken for the accoutrements of a censor and the black robes of the trial court may not exclude, from public school students, the light of ideas—irrespective of their varied hues. See American Bar Association "Statement on the Freedom to Read", reprinted in *The First Freedom,*

---

[16] "The law knows no heresy, and is committed to the support of no dogma * * * ." *Watson v Jones,* 80 US (13 Wall) 679, 728; 20 L Ed 666, 676 (1872).

Robert B. Downs, ed (American Library Associa-
tion, 1960). *Sweezy v New Hampshire, supra; Shel-
ton v Tucker, supra.*

The Supreme Court has clearly indicated that
book censorship is an odious practice. In *Hanne-
gan v Esquire, Inc,* 327 US 146, 157–158; 66 S Ct
456, 462; 90 L Ed 586, 593 (1946), the Court
observed:

"Under our system of government there is an accom-
modation for the widest varieties of tastes and ideas.
What is good literature, what has educational value,
what is refined public information, what is good art,
varies with individuals as it does from one generation
to another. There doubtless would be a contrariety of
views concerning Cervantes' Don Quixote, Shake-
speare's Venus and Adonis or Zola's Nana. *But a re-
quirement that literature or art conform to some norm
prescribed by an official smacks of an ideology foreign
to our system."* (Emphasis supplied.)

The Court has characterized the classroom as
" 'the marketplace of ideas.' The Nation's future
depends upon leaders trained through wide expo-
sure to that robust exchange of ideas which discov-
ers truth 'out of a multitude of tongues, [rather]
than through any kind of authoritative
selection.' " *Keyishian v Board of Regents, supra,*
385 US at 603; 87 S Ct at 683; 17 L Ed 2d at 640.
See, also, *Tinker v Des Moines Community School
District,* 393 US 503, 512; 89 S Ct 733, 739; 21 L
Ed 2d 731, 741 (1969).

Vonnegut's literary dwellings on war, religion,
death, Christ, God, government, politics, and any
other subject should be as welcome in the public
schools of this state as those of Machiavelli, Chau-
cer, Shakespeare, Melville, Lenin, Hitler, Joseph
McCarthy, or Walt Disney. The students of Michi-

gan are free to make of *Slaughterhouse-Five* what they will.

Reversed. Summary judgment of no cause of action is entered in this Court in favor of defendant Rochester Community Schools.

No costs, a public question being involved.